**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Robert Jackson,

      Plaintiff

v.

Roop, et al.,

      Defendants

Case No.: 2:21-cv-01772-JAD-EJY

**Order Granting in Part Defendants' Motion for Summary Judgment, Denying Plaintiff's Motion for Summary Judgment, and Denying as Moot Plaintiff's Motion for Leave to File Surreply**

[ECF Nos. 71, 76, 80]

Pro se Nevada inmate Robert Jackson sues High Desert State Prison (HDSP) corrections personnel John Roop and Richard Linford under 42 U.S.C. § 1983 for First Amendment retaliation. After screening and partial dismissal, only two retaliation claims remain: (1) a claim that Roop wrote Jackson up for "compromising staff" either to further a campaign tied to his vegan-diet litigation or to punish him for threatening to accuse Roop of retaliation, and (2) a claim that Linford found him guilty of that charge and imposed heightened sanctions because Jackson sought a neutral hearing officer. The parties cross-move for summary judgment. I grant summary judgment for Roop on Jackson's vegan-litigation theory because no evidence supports that narrative. But genuine disputes of material fact preclude summary judgment on Jackson's remaining retaliation theory against Roop and on his retaliation claim against Linford. So I refer this case to the magistrate judge for a mandatory settlement conference.

**Background**

This case concerns the actions of HDSP officers Richard Linford and John Roop in late 2019, though Jackson also points to earlier litigation over his religious diet as context for one

strand of his retaliation theory.[1]  In that earlier suit, Jackson sued Associate Warden Jennifer Nash, Food Service Manager Duane Wilson, and others over the challenges he was experiencing with his request for a vegan diet commensurate with his religious customs.[2]  Jackson alleges that Nash and Wilson attempted to defend that lawsuit by placing him under surveillance.[3]  Their goal, Jackson says, was to undermine his religious-belief suit by showing that he was accepting non-vegan food items from other inmates.[4]

**A.      Jackson's chow-hall encounter with Roop leads to a compromising-staff charge.**

In October 2019, Jackson was in the chow hall's diet line while Officer Roop, who had recently transferred to HDSP, was on duty nearby.[5]  After receiving his meal and sitting down, Jackson accepted four heads of cauliflower from inmate Anthony Cross who was clearing his tray.[6]  Roop observed that exchange, approached Jackson, requested his identification card, and took notes.[7]  What prompted that intervention and what was said next are sharply disputed.

Jackson contends that Roop's scrutiny mirrored monitoring that other officers had conducted at the direction of Nash and Wilson over his vegan-diet litigation.[8]  After observing the interaction, nearby inmates remarked that disciplining Jackson over the cauliflower would amount to retaliation for that litigation.[9]  When Jackson later stepped outside the chow hall at

---

[1] ECF No. 6 at 3 (Jackson's verified complaint).

[2] *See* ECF No. 104 in *Jackson v. State of Nevada et al*, 2:16-cv-995-APG-NJK.

[3] ECF No. 6 at 3.

[4] *Id.* at 13–14.

[5] *Id.* at 6.

[6] *Id.*

[7] *Id.* at 7.

[8] *Id.* at 6.

[9] *Id.* at 7.

Roop's request, Jackson claims that Roop asked him, "So you're gonna write me up for retaliation?  So I'm in for a rude awakening?"[10]  Roop told Jackson that he would be removed from the vegan-diet list because he was not permitted to accept food from another inmate.[11]  Jackson explained that he was unaware of any rule prohibiting inmates from accepting food and that he received vegan meals prepared separately because of pending litigation.[12]

Roop offers a different account.  He states that he believed Jackson was on the common-fare diet and observed him take food from more than one inmate's tray.[13]  When Roop requested Jackson's identification card and declined to explain why, Jackson volunteered that he had a lawsuit concerning vegan meals.[14]  Following that interaction, Roop saw that the inmate who had provided Jackson food told Jackson that Roop was going to write him up.[15]  Jackson then responded, "He's going to be in for a rude awakening.  I'll claim retaliation and he'll get put on the beach."[16]  Outside the chow hall, Roop told Jackson that common-fare-diet inmates may not take food from inmates who are not on common fare.[17]  Roop avers that Jackson interrupted and insisted that the trays he received food from were "common fare trays."[18]  That assertion did not align with Roop's training and understanding of prison procedures, but because Roop was new to the yard and aware that practices can differ between institutions, he confirmed the policy with

---

[10] *Id.*

[11] *Id.* at 7–8.

[12] *Id.* at 8.

[13] ECF No. 71-3 at 2 (notice of charges).

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

culinary staff.[19]  They informed him that there is no such thing as a "common fare tray" and that common-fare meals are premade and packaged.[20]  Based on that information and Jackson's statements, Roop concluded that Jackson had lied and attempted to use intimidation to avoid disciplinary action.[21]  Roop prepared an incident report, and a shift supervisor added a compromising-staff charge to it.[22]  More than a month later, Roop served Jackson with a notice of charges for "compromising staff."[23]  Jackson pled not guilty to that charge and contends that the notice falsely accused him of lying about his diet and attempting to intimidate staff to avoid discipline.[24]

**B.      After presiding over a separate disciplinary hearing involving Jackson, Linford conducts Jackson's "compromising-staff" proceeding.**

Several months later, Officer Linford presided over the compromising-staff hearing. Events leading up to and during that hearing are disputed.  Jackson alleges that before the hearing, Jackson testified at a separate disciplinary proceeding involving inmate Develle Merritte, who had been charged with theft for allegedly putting "too much peanut butter" into Jackson's modified diet.[25]  After that proceeding, Jackson asked Linford whether he would preside over Jackson's upcoming case.[26]  Jackson contends that Linford read Roop's write-up, smirked, and said that Roop had charged Jackson for being rude and that he intended to find

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] ECF No. 71-12 at 7 (Roop's answers to interrogatories).

[23] *Id.* at 9.

[24] *Id.*

[25] ECF No. 6 at 9.

[26] *Id.*

Jackson guilty of abusive language at the upcoming hearing.[27] Jackson filed a grievance requesting a neutral hearing officer, but he did not receive a response until six months later.[28]

While that request was still pending, Linford conducted the compromising-staff hearing.[29] At it, Jackson denied the charge, described his interaction with Roop, referenced his vegan-diet litigation, and presented testimony from the inmate who had given him the cauliflower.[30] Jackson contends that, during the hearing, he informed Linford that he had filed a grievance requesting a neutral hearing officer after learning that Linford intended to find him guilty.[31] Linford then reacted negatively and responded, "So you grieved my findings before my decision?"[32] Linford found Jackson guilty of compromising staff and imposed "maximum" sanctions that included 60 days in segregation, 60 days of statutory time loss, and 90 days of phone restrictions.[33]

Jackson appealed the decision through a caseworker.[34] He alleges that this same caseworker had earlier described the charge as "frivolous" and later informed him that the sanctions were amended to a reduced classification level, a 90-day "stay out of trouble" condition, and a shortened phone suspension.[35] Jackson pursued the appeal but waited

---

[27] *Id.* at 10.

[28] *Id.*

[29] *Id.* Another officer was at that hearing but did not speak during it. *Id.*

[30] *Id.*

[31] *Id.*

[32] ECF No. 6 at 11.

[33] *Id.*

[34] *Id.*

[35] *Id.*

approximately eight months for a decision.[36]  During that time, he remained at the lower classification level and lost level-one privileges, including opportunities to earn work and education credits.[37]  The guilty finding was ultimately overturned.[38]

Linford disputes Jackson's account.  He states that he did not predetermine the outcome of the hearing or signal an intent to find Jackson guilty of a lesser offense.[39]  He contends that he was unaware of Jackson's grievance until late in the hearing and that his decision rested solely on the evidence presented.[40]

**C.    Jackson sues NDOC, James Dzurenda, Brian Williams, Jennifer Nash, Duane Wilson, Richard Linford, and John Roop.**

Jackson filed this action under 42 U.S.C. § 1983 against multiple Nevada Department of Corrections officials, alleging retaliation, due-process violations, and harassment.  At screening, I dismissed the due-process and harassment claims but allowed First Amendment retaliation claims to proceed against Roop, Linford, Nash, and Wilson.[41]  As to Roop, I highlighted Jackson's allegation that Roop issued the compromising-staff charge as part of Nash's and Wilson's broader effort to undermine Jackson's earlier vegan-diet litigation by monitoring his eating habits and pursuing discipline.  As to Linford, I allowed a retaliation claim to proceed based on Jackson's allegation that Linford found him guilty and imposed sanctions in response to Jackson's grievance requesting a neutral hearing officer.

---

[36] *Id.* at 12.

[37] *Id.*

[38] *Id.*

[39] ECF No. 71-9 at 3, ¶ 4; ECF No. 71-14 at 2.

[40] *Id.* at 3–4, ¶¶ 12, 15–17.

[41] ECF No. 8.

The case was narrowed further on defendants' motion for judgment on the pleadings or, in the alternative, early summary judgment based on exhaustion.[42]  I dismissed the retaliation claims against Nash and Wilson as unexhausted but held that defendants had not met their burden to establish a failure to exhaust Jackson's retaliation claims against Roop or Linford.  So this case proceeded only on those retaliation claims against Roop and Linford.  Discovery is over,[43] and all parties now cross-move for summary judgment.

## Discussion

### A.    Standards for cross motions for summary judgment

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[44]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[45]  If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[46]

Who bears the burden of proof on the factual issue in question is critical.  When the party moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went

---

[42] ECF No. 51.

[43] *See* ECF No. 53.

[44] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[45] *Id.* at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[46] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 819 (9th Cir. 1995).

uncontroverted at trial."[47]  Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[48]

When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party (typically the defendant) doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual issue.[49]  The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[50]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[51]

**B.    The defendants argue that they are entitled to qualified immunity on Jackson's retaliation claims.**

An inmate has a First Amendment right to file grievances and to pursue civil-rights litigation in the courts.[52]  "Without those bedrock constitutional guarantees, inmates would be

---

[47] *C.A.R. Transp. Brokerage Co. v. Darden Rests, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations omitted)).

[48] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).

[49] *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[50] *Celotex*, 477 U.S. at 322.

[51] *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

[52] *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004).

left with no viable mechanism to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield."[53]

The defendants invoke qualified immunity on Jackson's retaliation claims. Qualified immunity shields government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[54] When a defendant raises this affirmative defense, the plaintiff bears the burden of demonstrating that both prongs are met. The evidence must be considered in the light most favorable to the plaintiff.[55] The plaintiff's failure to establish either prong compels summary judgment in favor of the defendant on qualified-immunity grounds. Courts "have discretion to choose which qualified-immunity prong to address first" and, depending on the conclusion reached for the first-analyzed prong, "need not address the other."[56]

To satisfy the first prong in a First Amendment retaliation case, the plaintiff must show that (1) the state actor took an adverse action, (2) because of (3) the plaintiff's protected conduct, (4) the action chilled the plaintiff's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate penological purpose.[57] For the second prong, a right is

---

[53] *Id.*

[54] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[55] *Isayeva v. Sacramento Sheriff's Dep't.*, 872 F.3d 938, 946 (9th Cir. 2017); *Tolan v. Cotton,* 572 U.S. 650, 657 (2014).

[56] *Isayeva*, 872 F.3d at 946 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[57] *Rhodes*, 408 F.3d at 567.

clearly established when it is "sufficiently clear that every reasonable official would understand that what he is doing violates that right."[58]  The Ninth Circuit has long held that prison officials may not punish an inmate for engaging in protected grievance activity, and that principle is clearly established for qualified-immunity purposes.[59]

**C.      Roop is entitled to qualified immunity on one of Jackson's retaliation theories.**

*1.          Jackson's second theory was not waived or improperly added.*

Roop first asks the court to disregard Jackson's argument that he was charged because he threatened to accuse Roop of retaliation.[60]  He contends that this case proceeds against him only on the theory emphasized in the screening order—that he acted under Nash and Wilson to undermine Jackson's vegan-diet litigation—and that the "threat-to-accuse" theory is an improper new claim.[61]  Roop is correct that the screening order focused on the vegan-diet retaliation theory.  But he cites no authority for the proposition that a screening order's emphasis on one pled theory eliminates another theory expressly alleged in the operative complaint.[62]  Jackson

---

[58] *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015)).

[59] *Rhodes*, 408 F.3d at 569 (9th Cir. 2005); *Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021).

[60] ECF No. 79 at 4; ECF No. 83 at 9.

[61] ECF No. 83 at 8–9.  Jackson seeks to file a surreply to clarify the history of this theory.  ECF No. 80.  Because I conclude based on the record that this theory is not a new one, I don't need to consider the arguments in Jackson's surreply to reach that conclusion.  So I deny as moot the motion to file a surreply.  *Id.*

[62] Other courts have allowed theories to proceed even when they were not addressed at the screening stage.  *See McDowell v. Rimington*, 2013 WL 5316455, at *2 (D. Nev. Sept. 23, 2013) (explaining that courts should consider the viable theories articulated in the complaint, even if some of those theories are "not explicitly addressed in the screening order"); *Clark v. Lind*, 761 F. App'x 633, 637 (7th Cir. 2019) (rejecting defendant's argument "that Clark forfeited any due-process claim by not pursuing it after the district court screened it" even though the district court "dismissed without prejudice any intended claim not recognized by the court" because "Clark

10

pled the conduct Roop now characterizes as "new" in the claims-for-relief section of his complaint.[63]  Because the court never explicitly dismissed that theory, I do not strike or disregard Jackson's arguments as an improper amendment.[64]  Nor is Roop prejudiced by its consideration now as he addresses its merits in his opposition.  I therefore consider both theories.[65]

### 2.    *Jackson cannot show that his vegan-diet litigation was a substantial or motivating factor in Roop's decision to charge him.*

Jackson's first retaliation theory is that Roop acted as Nash's and Wilson's "hypervigilant sentinel" and issued the compromising-staff charge to champion their effort to defeat his vegan-diet lawsuit.  Roop argues that Jackson cannot satisfy the "because of" element of this claim.  To establish a retaliatory motive, the plaintiff "must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct."[66]  That may be established with direct evidence or circumstantial evidence such as temporal proximity, expressed opposition to

---

raised the claim in his initial complaint and asserted it again during discovery, in his amended complaint, at summary judgment, and now on appeal").

[63] ECF No. 6 at 12–13.

[64] The defendants also note that Jackson's opposition exceeds Local Rule 7-3's 30-page limit for summary-judgment responses.  But the defendants do not request any particular relief, explain prejudice, or cite authority supporting the drastic remedy of striking a pro se prisoner's opposition for a modest overage.  And the overage is largely illusory: Jackson's response is 33 pages, but roughly three pages are a cover sheet and table of contents, and the remainder is handwritten.  Nothing suggests gamesmanship or an attempt to circumvent the rule.

[65] ECF No. 83 at 9–12.

[66] *Johnson v. Ryan*, 55 F.4th 1167, 1201–02 (9th Cir. 2022) (cleaned up).

11

the protected conduct, or proof that the defendant's stated reason was false and pretextual.[67]  But speculation alone cannot defeat summary judgment.[68]

Roop contends that the record contains no evidence that he knew about Jackson's vegan-diet litigation when he encountered the inmate in the chow hall—much less that he acted at Nash's or Wilson's direction as part of a coordinated monitoring effort.[69]  He attests that he had recently transferred to HDSP, had never met Jackson before the chow-hall incident, had never spoken with Nash or Wilson, and had no knowledge that day of Jackson's grievances, lawsuits, or meal plan.[70]  He states that he intervened because he observed Jackson take food from another inmate's tray and understood food sharing to be prohibited because it can mask coercion and exploitation.[71]

Jackson attempts to bridge that evidentiary gap in several ways.  First, he argues that defendants have not produced a written regulation prohibiting food sharing and that Roop's declaration about his training does not substitute for one.[72]  Second, he relies on Nash's testimony and internal emails from the vegan-diet litigation to show that staff were instructed in 2018 to monitor and document his meals.[73]  He further contends that Roop became aware of the vegan-diet litigation approximately eight days before issuing the notice of charges and that,

---

[67] *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011).

[68] *Getz v. Boeing Co.*, 654 F.3d 852, 865 (9th Cir. 2011); *cf. Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("'(M)ere allegation and speculation do not create a factual dispute for purposes of summary judgment.'").

[69] ECF No. 71-7 at ¶¶ 6–7 (Roop's declaration).

[70] *Id.* at ¶¶ 3–4.

[71] *Id.* at ¶¶ 12–14.

[72] ECF No. 78 at 15–16.

[73] *Id.* at 125 (Nash's deposition).

12

viewed together with Nash's monitoring directives and Roop's decision to intervene when no rule violation had occurred, those facts permit a reasonable inference of retaliatory motive.[74]

That evidence does not permit a reasonable inference of retaliatory motive. At most, it shows that Nash issued generalized monitoring instructions before Roop transferred to HDSP and that Roop was present in the chow hall and took notes after observing Jackson accept food. It does not show that Roop knew about the vegan-diet litigation at the time, acted at Nash's direction, or initiated the encounter because of the lawsuit. To reach that conclusion, a jury would have to stack inference upon inference—inferring knowledge from what staff "likely" knew, inferring coordination from Roop's location and note-taking, and inferring pretext from the absence of a written regulation despite Roop's explanation that training generally prohibited food sharing. Rule 56 does not allow a verdict built on that kind of scaffolding, so Roop is entitled to summary judgment on Jackson's retaliation claim against him that is based on the vegan-litigation theory.

### 3. Jackson raises a triable issue on his threat-to-grieve-or-sue theory.

#### a. A genuine issue of material fact exists on whether Roop's charge advanced a reasonable penological purpose.

Jackson's second retaliation theory is that Roop escalated the chow-hall encounter into a compromising-staff charge because Roop believed Jackson was going to accuse him of retaliation. Roop argues that even if Jackson engaged in protected activity by discussing retaliation or threatening to grieve or sue, the compromising-staff charge reasonably advanced a legitimate penological objective. The plaintiff bears the burden of proving the absence of a

---

[74] *Id.* at 24–25.

legitimate correctional goal.[75]  Although prison officials are entitled to deference in managing "the ordinary incidents of prison life,"[76] the adverse action must bear a rational connection to institutional security.[77]  An action that is "arbitrary and capricious" or "unnecessary to the maintenance of order in the institution" does not satisfy that element.[78]

The parties frame this dispute through the Ninth Circuit's decision in *Entler v. Gregoire*. In *Entler*, prison officials disciplined an inmate under a coercion-or-intimidation rule after he sent written complaints about prison conditions that included threats to sue if his concerns were not addressed.[79]  The panel held that threats to pursue civil litigation fall within the First Amendment's protection of the right to petition and that officials may not transform grievance-related speech into "intimidation" simply by invoking a coercion regulation.[80]  Because Entler's communications largely articulated his grievances in a respectful tone and he had the right to threaten suit if those grievances went unanswered, the court concluded that the asserted connection to preventing staff coercion was "so remote as to render the policy's application arbitrary or irrational."[81]  And viewing the facts in Entler's favor, the court held that a reasonable official would have understood that disciplining an inmate for threatening to initiate civil litigation was constitutionally impermissible, precluding qualified immunity.[82]

---

[75] *Johnson v. Ryan*, 55 F.4th 1167, 1202 (9th Cir. 2022) (citing *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995)).

[76] *Pratt*, 65 F.3d at 807 (quoting *Sandin v. Conner*, 515 U.S. 472, 482–83 (1995)).

[77] *Entler v. Gregoire*, 872 F.3d 1031 (9th Cir. 2017).

[78] *Watison v. Carter*, 668 F.3d 1108, 1114–15 (9th Cir. 2012).

[79] *Entler*, 872 F.3d at 1036.

[80] *Id.*

[81] *Id.*

[82] *Id.* at 1042–43.

14

Roop argues that this case is meaningfully different. The compromising-staff rule prohibits conduct designed to violate institutional safety or obtain favorable treatment,[83] and Roop says that he applied it because Jackson attempted to secure an improper benefit—continued food sharing—by threatening retaliation.[84] He avers that Jackson admitted taking food from another inmate's tray, discussed retaliation after Roop began taking notes, and made remarks that Roop interpreted as threats intended to pressure him into overlooking a rule violation. So issuing the charge bore a direct nexus to institutional security and preventing coercion, Roop contends.

Jackson's evidence, however, would permit a reasonable jury to reject the factual predicates necessary to reach that conclusion. His compromised-staff conviction was overturned on disciplinary appeal, and the appeal responder concluded: "I see no evidence where you attempted to compromise staff."[85] Jackson also states that a caseworker told him that the charge was "frivolous."[86] A reasonable jury could credit that evidence as probative that the charge was unnecessary to the maintenance of order and not meaningfully connected to institutional security.

The parties also sharply dispute what occurred in the chow hall and how Jackson's remarks should be understood. Cross avers that he routinely offered Jackson vegetables he intended to discard so the inmates discussed among themselves whether Roop's actions would be "retaliation" related to his vegan-diet litigation.[87] He attests that Jackson "never once addressed

---

[83] ECF No. 76 at 59 (Linford's answers to interrogatories). I acknowledge that Linford objected to this interrogatory on the basis that it also asked for the document with that definition. But he did not object to request for the definition.

[84] ECF No. 83 at 10–13.

[85] ECF No. 78 at 99.

[86] ECF No. 6 at 11.

[87] ECF No. 78 at 112–113 (Cross's affidavit).

anything towards Roop."[88]  Roop, by contrast, testifies that the statement was directed at him because Jackson said it loudly enough for him to hear.[89]

This factual dispute determines whether this case falls within *Entler*'s reasoning or outside it.  If a jury credits Jackson's account, the speech may resemble the respectful right-to-sue communications in *Entler*.  But if a jury credits Roop's account on the tone and character of Jackson's speech, then *Entler* may not be dispositive.  Because that factual dispute bears directly on whether the challenged action violated the First Amendment, Roop is not entitled to qualified immunity as to the first prong.[90]

> b.     *Qualified immunity cannot be resolved on this record.*

Roop alternatively argues that, even if a triable issue exists on the merits, no clearly established law would have put a reasonable officer on notice that issuing this charge would violate the First Amendment.[91]  He identifies the right at issue as the right to be free from a "false" disciplinary charge and contends that qualified immunity applies because issuing a "true" notice of charges is not unconstitutional.[92]  But Jackson is asserting that he engaged in protected petitioning activity and that Roop punished that activity by escalating the incident into a compromising-staff charge.  If a jury credits Jackson's version of the chow-hall discussion, *Entler* provides the clearly established rule.  Because the clearly established analysis turns on which factual account the jury accepts, I cannot resolve Roop's qualified immunity argument on summary judgment.

---

[88] *Id.*

[89] ECF No. 76 at 48 (Roop's answers to Jackson's interrogatories).

[90] *Wilkins v. City of Oakland*, 350 F.3d 949, 955-56 (9th Cir. 2003).

[91] ECF No. 71 at 14–15.

[92] *Id.*

**D.    Linford is not entitled to summary judgment based on qualified immunity.**

*1.    Jackson's evidence creates a triable dispute on the "because-of" element.*

In his second retaliation claim, Jackson's alleges that Linford previewed a lesser disposition before the hearing, learned that Jackson had grieved him in response, and then imposed the more serious compromising-staff conviction.[93]  Linford seeks qualified immunity by arguing that Jackson has no evidence that Linford acted because of protected conduct and that the hearing audio refutes any retaliatory-motive theory.[94]  Linford avers that he did not announce at Merritte's hearing that he planned to find Jackson guilty of abusive language,[95] he did not state during Jackson's hearing that he intended to reduce the charge,[96] and nothing on the recording shows that his ultimate decision was prompted by any protected activity.

Linford's "no evidence" characterization overstates the record.  It is true that the audio from Jackson's disciplinary hearing does not capture any announcement that Linford intended to reduce the charge,[97] and nothing in that recording shows Linford expressly tying his ultimate decision to grievance activity.  But Jackson's verified complaint places the conversation with Linford after Merritte's hearing, so the absence of that conversation from the hearing audio is not

---

[93] The defendants argue that that this theory is not properly before the court because the screening order referenced Jackson's allegation that Linford intended to find him guilty of abusive language, while Jackson now suggests that Linford previewed a different minor violation.  ECF No. 83 at 13.  But the precise label of the lesser infraction is not dispositive.  Jackson has consistently maintained that Linford indicated he would impose a minor violation before learning of the grievance.  Whether that minor disposition was described as "abusive language" or "trading, bartering, and lending" does not alter the retaliation analysis.

[94] ECF No. 71 at 13–14; ECF No. 72.

[95] ECF No. 72-3.

[96] ECF No. 72-2.

[97] *See id.*

dispositive.[98]  Plus Linford's own e-mail concedes that a pre-hearing discussion occurred: Linford wrote that he did tell Jackson that he was "likely" to be found guilty of compromising staff after reviewing the evidence, but did not yet reach a final decision.[99]

The hearing audio itself contains circumstantial evidence of retaliatory timing.  During the proceeding, Jackson tells Linford that Linford had said he would "drop it down," which prompted Jackson to "put something in the mail."[100]  Linford immediately responds: "So you've already grieved my finding when I didn't find anything yet?"[101]  Three minutes later, Linford finds Jackson guilty of compromising staff "based on the evidence."[102]  The later appeal reversal—concluding that there was "no evidence" that Jackson attempted to compromise staff—does not prove retaliation, but it does bear on pretext.  If a jury credits that conclusion, it could reasonably question what evidence justified the conviction and whether the decision was instead influenced by Jackson's grievance activity.

Jackson also relies on prison disciplinary regulations to provide structural context for his causation theory.[103]  He points out that the regulations distinguish between minor and major violations, with major violations—like compromising staff—requiring a full disciplinary hearing committee of three people.[104]  Jackson theorizes that if Linford told him he would "just" find him guilty of a minor violation, that statement would align with how the regulations treat lesser

---

[98] *See* ECF No. 72-3.

[99] ECF No. 71-14 (Linford's email).

[100] ECF No. 72-2 at 13:01.

[101] *Id.* at 13:07.

[102] *Id.* at 16:05.

[103] ECF No. 76 at 5.

[104] ECF No. 78 at 63.

infractions and reasonably signal a reduced disposition.  And because Linford was the hearing officer who controlled the proceeding and imposed the outcome, Jackson argues that he was the only person with authority to "drop it down."

Linford does not meaningfully dispute the regulatory distinction or Jackson's description of the hearing officer's role.  Instead, he characterizes this evidence as an attempt to revive a due process claim that was dismissed at screening.[105]  But Jackson does not contend that the deviation from internal regulations is itself unconstitutional.  He offers the regulations as contextual evidence that makes his version of events plausible and relevant to retaliatory motive.  Linford provides no alternative explanation for why the alleged pre-hearing preview—if credited—would be immaterial to causation.  In sum, the evidence Jackson provides therefore creates a material dispute that precludes me from finding prong one of qualified immunity at this stage.

### 2. Linford's entitlement to qualified immunity cannot be resolved on this record.

Linford argues that, even if a factual dispute exists, no clearly established law would have put a reasonable officer on notice that his conduct violated the First Amendment.  He frames the right as a right to be free from a "false" disciplinary outcome and invokes the deferential "some evidence" standard.[106]  But that framing assumes Linford's version of events—that he simply adjudicated a charge supported by evidence and played no role in escalating it.  If a jury credits Jackson's circumstantial evidence, the law clearly establishes that such retaliatory discipline violates the First Amendment.  Nor does the "some evidence" standard resolve the issue.  The question here is not whether Linford could identify some evidence in Roop's report to support a

---

[105] ECF No. 83 at 14.

[106] ECF No. 71 at 14–15.

disciplinary finding, it is whether he imposed that finding for a retaliatory reason.  I therefore cannot resolve the question of qualified immunity at this stage.

**E.      The question of punitive damages remains for the jury.**

The defendants also seek summary judgment on Jackson's request for punitive damages. "Punitive damages are awarded in the jury's discretion 'to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future.'"[107] A plaintiff seeking punitive damages must show by clear and convincing evidence that the defendant's conduct was "motivated by evil motive or intent, or . . . involves reckless or callous indifference to the federally protected rights of others."[108]

This record does not permit disposition of punitive damages on summary judgment.  The defendants' argument rests on their version of events—that the charges were properly issued, that the disciplinary proceedings were routine, and that no retaliatory motive was present.  But Jackson has produced evidence from which a reasonable jury could find that defendants acted in retaliation for protected grievance activity.  If a jury credits that version, it could also conclude that the conduct reflected at least reckless indifference to Jackson's First Amendment rights. Because that determination turns on disputed facts and credibility, summary judgment on punitive damages is not available.

**Conclusion**

IT IS THEREFORE ORDERED that defendants' motion for summary judgment **[ECF No. 71] is GRANTED in part.**  The defendants are entitled to qualified immunity on Jackson's vegan-diet litigation theory of retaliation against Roop; summary judgment on all other claims is

---

[107] *Smith v. Wade*, 461 U.S. 30, 54 (1983) (quoting Restatement (Second) of Torts § 908(1) (1977)).

[108] *Id.* at 56.

denied.  Jackson's motion for summary judgment **[ECF No. 76] is DENIED** because genuine disputes of material fact on his remaining claims exist.  Jackson's motion for leave to file a surreply **[ECF No. 80] is DENIED as moot.**   So this case proceeds on two retaliation theories: (1) that Roop wrote Jackson up in retaliation for Jackson's threat to accuse Roop of retaliation, and (2) that Linford found him guilty of compromising staff in retaliation for Jackson's filing of a grievance against Linford.

IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for a mandatory settlement conference**.  **The parties' obligation to file a joint pretrial order is STAYED** until 30 days after that settlement conference.

IT IS FURTHER ORDERED that **this case is referred to the Pro Bono Program** to seek an attorney to represent Jackson without charge.[109]  Jackson is advised that pro bono attorneys are scarce, and despite the program's efforts, it is entirely possible that no attorney will ultimately be found to represent him.  Therefore, **Jackson must continue to represent himself unless and until an attorney has accepted his representation**, and the court is not likely to extend any deadlines or continue any matters while the search for counsel is underway.  Jackson is ORDERED to promptly complete and return any forms provided to him by the program.

_____
U.S. District Judge Jennifer A. Dorsey
March 3, 2026

---

[109] This does not preclude a pro bono attorney from seeking an award of fees and costs from any recovery in this case, or from seeking reimbursement of costs through program resources.